We'll proceed to the second case, John Doe v. the Catholic Relief Services, and we'll hear first from Mr. Dugan. Thank you, Your Honors. May it please the Court. This case involves the official humanitarian agency of the Catholic Church in the United States. It also involves a religious belief central to Catholic social teaching, namely that marriage is a sacramental union between one man and one woman. And the undisputed evidence in the record, this case being a little bit of a different procedural posture than the last one, shows that Catholic Relief Services sincerely believes it is never morally permissible to extend spousal benefits to an employee in a same-sex union. Now, we heard quite a bit about church autonomy so far this morning. I'm going to share a little bit more, and then I hope to cover some additional points as well in my limited time here. But I want to jump in on something that Counsel for Liberty said in his rebuttal with respect to the Union Gospel case in the Ninth Circuit, because I really think that that case is helpful both in terms of showing how the Supreme Court's teaching flows down into cases that deal with fact patterns more analogous to what you have in front of you today, as well as perhaps with respect to the issue of limiting principle. So what's interesting about Union Gospel, I was reading it again this morning, is it relies very heavily on the Supreme Court's language from the ministerial exception cases, even though, obviously, it's extending that language to a different situation, one in which you don't have a minister, one in which you have, in fact, IT workers, which is not so different from John Doe's situation. And what's interesting about it is that the Court says, look, you have some cases that involve ministers, and that seems to be an increasingly capacious category, and you have other cases where you have employees who are not ministers, but the policy of the organization or the mission of the organization is such that if those employees are, if you're engaging in employment practices that are inconsistent with your faith and doctrine, that can profoundly compromise your ability to carry on your mission. So we're the Catholic Church, right? We are, CRS is controlled by the U.S. Conference of Catholic Bishops. It doesn't get much closer to the Church than that, and so that's my first comment on limiting principle, which is that we're talking, in this case, we're talking about the Church. So this, the issue here is the issue we touched on briefly, what religious organizations are covered by this, right? Exactly, Your Honor. So that's one limiting principle is who gets to invoke this principle. Correct, and I think Union Gospel says, in the conclusion to the case, we're not deciding today about the application of Church autonomy to hospitals. We're not deciding as to businesses. We're not deciding as to the hobby lobbies of the world. So we're the Church. So if you want to have an institutionally conservative application of the Church autonomy doctrine, one limit is to say, well, we're going to apply it to churches and to religious ministries that are connected to churches, and save for another day. So just since you brought it up, I understand you think we're good here, but what if it is hobby lobby? What if it is Chick-fil-A? Do you have a position on whether it applies there? CRS does not, and I think part of the reason goes to some comments Judge Floyd made earlier about commerce. I mean, the further you get into sort of the ordinary business world, the more you may have competing interests that the Court would have to consider. But we're the Church, and we're not hobby lobby, and we're not Chick-fil-A. We're doing, you know, nonprofit ministry around the world. And we're talking about, and so this gets me to my second limiting principle. And by Church, you mean the Catholic Church? The Catholic, exactly. That's right, the Catholic Church. The Catholic Church, which has tentacles in all kinds of places, well beyond what we're dealing here. Maybe not hobby lobby, but there are a lot of places, Catholic churches, it's all over the place. Hospitals, universities. But you're saying today you're not, you just want to limit it to this particular entity here. And we have to find a way to say laws are being limited just to this and not to something else, or that implying something else, we've got to do sort of a fact-searching type determination of what it is. Yeah, well, I think that the Court can do these things in steps. I mean, Your Honor made the observation in the last argument that the Supreme Court has not rushed to provide explicit guidance on some of these issues, and so— Well, it's completely done that. I mean, it has not only not rushed it, it's had it, it's had its chance, it just won't do it. It hasn't done it. Well— But in the interim, how has the world turned under the existing law in these situations? What, I mean, what is the change? Is this a change or is this something already that's being done? Just because it's being done, I mean, there's no law on it, so how does this work so far? Well, I mean, that was the point that I was making about Union Gospel, because when it's describing church autonomy, it's using the very language of Our Lady of Guadalupe. When it's talking about internal management decisions, that's not the Ninth Circuit, that's the Supreme Court. Now, it's applying that to, okay, a non-minister situation, but it's the same point. Why do we even have the ministerial exception in the first place? Why do we have any of these protections? It's because we understand that churches are different. We understand that although churches can engage in many different activities in society, they're also—back to the beginning, right? We've always viewed the church, religious institutions, religious non-profit organizations as being special, as being distinct because of the inherent First Amendment implications in regulating churches. What's the— That's rather expansive in and of itself when you say churches are different. We probably, most of us here, are thinking in terms of Christian religion, but it's—religion covers a whole swath of areas. Sure. I mean, it's not what we do in terms of the Christian religion. Religion is very broad, and it covers, as I said, everything from devil worshipers to whatever. I mean, so if you've got a sincerely held belief, I think, is the groundwork on it. That's where we are, and we've created these exceptions, which seems to me, and that's the question, is what—are they really exceptions, or is it now just the state of being that once I tell you what my doctrinal beliefs are, I'm allowed to discriminate and do what I want to do? Well, I think— Is there any longer an exception? Is that what you're asking us to do away with, the so-called exceptions? I think that Judge Quattlebaum's question in the prior argument about pretext inquiry is helpful here. I mean, I don't see why the pretext inquiry is materially different from the question of sincerity. I think courts are required to determine whether when a religious claimant comes in and says, look, I have to take the employment action X. I have to do this thing. The question is why. Do you have to do that because of a sincerely held—a preexisting sincerely held belief, or are you taking that position because of some other ulterior motive? So what if, on that, what if in your situation—well, I'll just take it out of this case. What if someone says, I'm not going to hire same-sex homosexuals, I'm not going to hire transgender individuals, that's a sincerely held religious belief. But the plaintiff comes in and says, that's pretextual, you've got all these other doctrinals and you've hired people who are inconsistent with all your other doctrinal beliefs. That makes me think you're just using this as a way to discriminate against individuals who are transgender. I mean, is that the sort of thing that could be an inquiry into pretext? I think it would have to be, Your Honor. And it's not—it doesn't offend—you know, there's this discussion with my friends in the briefing about whether the pretext inquiry or the sincerity test would itself offend church autonomy. And the answer is no. Courts are equipped to test it in a way to find—because the question is, what do you  And this is—I made this point, I think, in the reply brief. The court's not going to question whether it's a good belief. The court's not going to question whether it's a rational or an internally consistent belief. But the court will test whether it is a belief. And we're coming here at the end of the case, right? That's unlike the Liberty case. We had a trial. We had years of discovery. Mr. Doe had every opportunity to examine whether Catholic Relief Services sincerely— So we've got to do this in every case that comes up here? I mean, is that what you're saying? You're saying every entity out there that has some of these things, we've got to go through that same kind of analogy and conduct a little mini-trial by the bench and see if you have a sincerely held belief in every one of them? It may not always be necessary, Your Honor. I mean, it could be—we had some discussion about what's in the committee. But I think if I have any time, it would be necessary. I mean, you know how many people out there, once they hear that, are going to bounce up and send something to this court and all across this country and say, all right, Judge, we've got a sincerely held belief. Let's go through the analogy of it. Every one of them. We've got to do all that. If we're going to do a pretextual analysis in all of these. Well, I think the alternative is that religious employers like my client, Catholic Relief Services, are put in a position where because of the evolution in the law after Bostock, they're required to do things that are fundamentally inconsistent with their religious beliefs. Well, let me ask you this. From the record—and correct me if I'm wrong—  Doe was gay when you hired him, if you knew it. That's true. Now, he married, and you've got this problem now. So are we talking about applying, in this case, a religious belief, or are we talking about him being a part of the ministerial exemption? We are not contending that he's a minister. We are contending that our providing him with—our taking the affirmative act of providing him with spousal health benefits violates our conscience. That's the issue. Okay. And so, at the time, he was gay. He's still gay. True. He just happens to be married to another man. I'm having a little—explain to me how that violates your—I understand we can't get to that point in one sense, but on the other hand, it would help me to know a little bit of an inconsistency.  Your Honor, and it goes to the other limiting principle that I was hoping to raise, so these kind of connect. For us, in our religion, so the Catholic teaching, we have no problem with ecumenical hiring. In other words, we hire people every day who have different lifestyle choices than we do. That's fine. Where it crosses the line in our religion is when we're required to do an affirmative act that has the effect of endorsing behavior that the Catholic Church teaches is sinful. So we are happy to have Mr. Doe—he's no longer with us, but we were happy to have him as an employee. He did great work. What we can't do, where it crosses the line for us, is to give him a benefit that is for spouses, because the Catholic Church teaches that only men and women can be married. Another follow-up there. At the time he was hired, the representation was made by your insurance folks that that person would be covered, and he did not mislead the Church. That is true. That's right. No. Totally agree with that. And secondly, you didn't marry him. He was married in a civil arrangement. That's right. But it still violates your faith. It does. And I'll just—as the court's— But let me make sure I understand your point where Judge Floyd is going. The defendant here, at least the party here, was already gay. He let you know that. True. He was married. He let you know that. True. He said he wanted health insurance. You said okay. You gave it to him. And now, didn't you say, no, we made a mistake because we don't recognize individuals who would be married to the same sex. But your problem here is you won't give health insurance, but you will employ a person, as I understand you, who is married to the same person. That's exactly right. But you won't give health insurance. Correct. That's right. That's right. Because you have no problems with a same-sex person being married to a same-sex person. Well, I—no, pardon me. In other words, you don't fire someone for that. That is true. But if they want that person to whom they are married under the law, just like everybody else out there, you won't give them health insurance. But if he was married to a woman, you would. Yeah. And you say that you can do that because after he had already started working for you, after you told him he could get health insurance, after you gave health insurance to them, then you came up and said, no, we don't believe this. We're not giving you health insurance. I mean, I would frame it a little differently. There were mistakes made by clerical professionals. But not the individual who was seeking the mistakes in the clerical is you. I mean, that's you. You're not just the clerical. Those are your clerical people. So you made mistakes, you're saying. We have never walked away from that, Your Honor. We've acknowledged since day one. We made a mistake, and when we discovered the mistake, we did what we could to try to correct the mistake. Well, Judge Cardinal Baum took the liberty crowd through the same thing. So let me do this. I hate that you're out of time. We can't mess with your church autonomy. We can't mess with your ecclesiastical aspect. We can't mess with your church discipline. And there's a fourth one I can't remember. So how does this fit in one of those three or four things? Doctrinal, ecclesiastical, church discipline. I wish I had a note in front of me, but it's four on my head. Yeah, well, the Union Gospel case sort of answers that question by connecting back to not only Watson, which is what Your Honor is referring to, those various aspects of church autonomy, but also the ministerial exception cases. And what it says is adjudication of discrimination claims would require courts to evaluate whether an institution's hiring practices, in fact, are essential to its mission, which is an inherently religious question. So it actually, we're not just saying, oh, you can't touch us because we're the church. What we're saying is for you to come in and evaluate whether it's necessary for us to have this policy, whether this policy, this benefits policy, is compelled by our religion, that is itself a religious question, and that is precisely what Watson said courts can't  The Union Gospel also held that religious motivation cannot be a pretext for non-religious discrimination. Absolutely. And that's the safeguard. That's the safeguard. That's what stops this from becoming a mechanism for religious actors or purportedly religious actors to say, well, I don't want to hire that person, or I don't want to provide that benefit. Courts are well equipped to test pretext. They do it every day. This is no different than that. Counsel, go ahead. If I could ask a kind of maybe structural question. We've been talking about what these church autonomy doctrine principles are. My question is when we should look at them or what's the nature of them. Do you have a position on whether these are threshold immunity sort of questions that must be addressed at the outset of litigation or here, I mean, Title VII is part of this case too, whether we would avoid constitutional issues and deal with statutory issues first. So I'll answer that two ways. First, I think the McRaney case in the Fifth Circuit does a really nice job of explaining sort of the quasi-jurisdictional nature of the defense or the issue. And even just the procedural history of McRaney, that went up twice, right? The first time around, the court said, we're not sure if church autonomy applies here. The second time around, the court said, after summary judgment record was in place, yes, it does. So the answer to your question, your first question, Judge Claude Obama, is the court should reach it at the earliest feasible opportunity, but that won't always necessarily be at the pleading stage because the reality is you're going to have to look at the facts and decide, do we have enough information to do that pretext check to make sure this is not just running a muck? And I said I had a second point, but I don't remember what it was, so I think I'll just say that. That answers my question, I think, in terms of understanding your position, so thank you. You've got a little time coming back for rebuttal, so we'll hear from you then. In the meantime, I think your co-counsel there wants to have a word. Mr. Sturgell. Good morning. May it please the court, I'm Lowell Sturgell from the Department of Justice representing Intervenor of the United States. The district court also erred by precluding CRS from relying on the Religious Freedom Restoration Act as a defense to Doe's Title VII and Equal Pay Act claims on the ground that RFRA does not apply in suits between private parties. Texturally, RFRA, as we've heard already, amends all federal law and it provides that a party can raise RFRA as a claim or defense in a judicial proceeding, so that's what we have here. These are claims under federal law. But the thing about RFRA is that it's a governmental, they have a governmental party to it? Yes, so the government is involved in this case. Who's the governmental party? You're amicus, I guess, but are you it? I think he's looking at me. You think we are? So we're a governmental party on everything, you think we're a party to something? So first of all, We're going to get in the end of this. I've heard that argument before, but maybe I'm not as convinced as some of the others have been to it already, but who's that governmental entity? You think it's us? So first of all, Congress is No, no, no, I need to answer that question. Who is the governmental entity in this party that's a party to this case? It is The case, the government doesn't have to be a party to the case. It has to be So you're saying that It has to be a result from government action You don't need a governmental party, what do you need as a government? Just some interest, governmental interest? The statute defines government to include a branch, so Congress is a branch. Congress enacted Title VII and the Equal Pay Act. And it's those obligations that DOE is relying upon to provide the basis of this suit. And it's, you mentioned the court, so what DOE wants is a ruling from this court enforcing those provisions. So counsel, if that's under, I think there's a few ways to deal with the role of RFRA, it seems to me. One is, do you have to have a government party? And it seems like you're saying that you disagree with that. That you don't have to have a government party. That if you have a statute that burdens religion, Congress has in effect done so in that fashion. Is that right? That's correct. So if that's the case, are we essentially then applying, I guess what we're doing there is we already have law that is constitutional law that applies when the government burdens religion. And I guess what we had is cases that applied rational basis review. So what RFRA does, if it applies in that way, would get a straight to strict scrutiny without having to deal with neutral and general applicable and things like that. That's how it, that's, because we got the law that says you can't do that anyway, but we have to go and decide what level of scrutiny. I think you're saying RFRA, as you read it, just takes a straight to strict scrutiny. And I understand you're right. Well, first of all, this case I think illustrates how RFRA would work in a case between private parties. First of all, CRS would bear the burden of showing the prima facie elements of a RFRA claim. So it would have to show that it has a sincerely held religious belief that's being substantially burdened by a government action. Which is what you'd have to do in a normal First Amendment case. Well, no, Your Honor, in a First Amendment case under Smith, the question is whether, as you mentioned, the government action is neutral and generally applicable. And the plaintiff has to show a burden on religion, but religious discrimination is itself a burden. So you don't have the same type of substantial burden requirement as RFRA imposes. That's an additional burden. But if I could just finish up very quickly. So then once the prima facie case, if it's made, is made, then the plaintiff would step into the shoes of the government and make the argument that there's a compelling interest that the federal statute furthers, and it's the least restrictive means. And that's what's happened in the case, right? CRS in this case has said it has a substantial burden, and DOE says, well, yeah, but there's a compelling interest, and it's the least restrictive means. Judge Floyd, I'm sorry. Well, and I'm trying to follow that. I got my hearing aids in, too, by the way. Texturally, that statute says against a government. So who is the government again? And in answering that, I mean, Judge Qualibon set it up for you and said, you know, it's Congress or whatever. Give us a case that said that? I don't know if I've seen a case that said that that makes them a governmental party in that instance. I'm not sure the government wants to be a party in every instance like that, because then it sets up that the relief is against the government. That's really, it's a point that probably needs to be at least, I think you need to be more specific about it. It may support you, but give us something there. The case that supports that the government is involved in this case. So, again, our position is the government doesn't have to be a party in the case. So you can't get anything against the government if the government's not a party, is it? Can you? That's Judge Floyd's question, which I'd like to answer. No, that's my question. You can't get anything against the government if you don't have the government as a party. Well, yes. If the court were to hold that RFRA does not, the RFRA does provide a defense, then the plaintiff would not be able to rely on Title VII. In that sense, the relief would be against Congress, because Congress enacted the burden. You asked for a case, the Second Circuit, Hankin's case, held that RFRA does apply in a case between private parties like this. So we rely on the Second Circuit case. And, Judge Floyd, I've forgotten your question. No, my question is just simply, I don't know who the government is. You're telling all the principles of justiciability, which includes being able to get relief. Where are they going to get the relief? Are they going to have to turn around and sue Congress? So you mentioned the phrase appropriate relief against the government. The position we have is that the term government modifies appropriate relief. And what Congress was doing was making it clear that it was waiving sovereign immunity for an official capacity suit for injunctive relief against the government. So that's textually our position on that. But again, the relief could be against Congress, in a sense, because Congress is the one that enacted the statute. And I also want to point, Judge Floyd, to your opinion in the Great Stakes case, which decided in the reply brief, which held that in a Title VII case, Congress intended for plaintiffs to act as private attorneys general. And it put its thumb on the side of plaintiffs in Title VII cases, in the sense that, as you pointed out, Title VII authorizes attorney's fees for plaintiffs in Title VII cases, except in special circumstances. And that's statutorily provided. And defendants don't get that. They can get fees, but only under much more stringent circumstances. So that's another sense in which Riffer says that the government can include persons that are acting under color of law. And I think Great Stakes basically says plaintiffs, in a case like this, where they're relying on Title VII, are acting under color of law. Your time is up, and so we'll come back to you, because you're going to offer a few minutes of rebuttal. But let's hear from the other side of you. Mr. May? Good morning, Your Honors. May it please the Court. My name is Anthony May, and I represent John Doe in this case. Your Honor, a few undisputed points that are relevant to the analysis today. First, most CRS employees are not required to adhere to the Catholic faith. Second, as Judge Floyd pointed out, Mr. Doe was married to a man. He was hired, and he was told all dependents are covered. Third, Mr. Doe never was employed in a ministerial, representational, or religious role as defined by CRS while working for that company. CRS provided Mr. Doe dependent health benefits to his lawfully married spouse for 16 months, and they were happy to have him. But what they wanted to do was pay him differently. Title VII doesn't allow that. And Judge Nguyen, you asked the question, what is the state of the law? And I would turn this Court to its opinion in Billard. No federal court in the country has embraced CRS's argument, and I'm inserting secrets. We know that's not true anymore, right? Well, as of 2024, and all of those that have have been complete outliers and are distinguishable from what we have in this case. Well, there's none that we're bound by, is what you mean. There's no Supreme Court case on this. The Supreme Court has no pocket on it. And if there's another sister, I don't like the word sister, peer circuit that has operated on this, we can certainly look to it for guidance. Because we respect our peers, but we're not bound by it. So Judge Qualibon is correct. There's a peer circuit that has gone in a different direction. That is absolutely correct. Is there a peer circuit that has, I should know this, but I've looked at so much, I'm drawing a blank right now. Is there a peer circuit that has decided a case contrary to the Ninth Circuit's Union Gospel case? I think, you know, as Union Gospel was just a few weeks ago, I don't think there's been an opportunity for that to happen. Beforehand? No, no. Right, Your Honor. So the only circuit that has addressed the question that we face here has ruled it in a way different than what you're saying? It has. And I would say in that, it is distinguishable for a number of reasons. I mean, of course, that's not binding, as Judge Wynn says, but in terms of what we're facing here, one federal appellate court has addressed it, and if we were to find that persuasive, it would be against your client's interests. That is absolutely correct. But I think this court can turn to its own precedent, particularly in Rayburn, in Kennedy, and in Billard, where the court has over and over again, for 30 years, discussed the fact that there are, in fact, employees that work for religious employers. So that's the differentiation. That circuit was not bound by our cases. We are bound by our cases. So we have to look at that to see if we either agree, but we have to agree in light of the cases that we are bound by. Yes, that's exactly what I'm saying, Your Honor, which is why I'm saying that the court, in fact, should not follow the Ninth Circuit, because it's bound by its own cases and its own precedent. And what we have from Kennedy, from Rayburn, and from Billard is this constant reminder that there are employees that fall outside of the bounds of these constitutional protections afforded to religious employers. So, can I make sure I understand? I think I did this in another case. You don't deny there's a church autonomy doctrine, correct? Correct. And that when it applies, it prevents courts from scrutinizing, reviewing the decisions, actions of religious organizations that qualify? That is correct, when it applies. And it applies in the context of actions related to ministers, as that term is defined, right? Yes, particularly in the employment context. This court has consistently said that it applies to ministerial employees. And it applies, we talked about things earlier like inter-church discipline and doctrinal things. And I understand your position is that it doesn't apply to the employment of non-ministerial employees, correct? That is correct, Your Honor. Has the Supreme Court ever said that? I don't believe that the Supreme Court has ever gone so far to say that. And I think what that harkens back to is this discussion in Bostock. But what the Supreme Court, and whether we call it punting, whether we call it they just haven't addressed it, what the Supreme Court, I read Bostock to say, is that there are essentially any number of arrows in a quiver that a religious employer has at their disposal to ensure that their rights are protected. But that doesn't mean that an incidental burden on religion amounts to a violation of the First Amendment or a violation of the Church Autonomy Doctrine. Do you think Bostock supports that proposition? I think that's why Bostock points to, again, he says these exemptions have been around for as long as we've had them. And it's for courts, and I think, think about the nature of these exemptions. They're so unique and so fact-specific based on the individual employee, the individual employer, so for the Supreme Court to carve out some sort of rule that could apply in every single employment scenario, it would, as this Court is well aware, it's very difficult to do. Because it requires this Court, without wading into the theological thicket, as CRS contends, to examine the facts of the case. Examine what are the duties of the employee. What is the mission of the organization? How does that individual's duties further that mission? Is it direct? Is it part of a ministerial position? All of those are facts that courts can and often do examine, without wading into a theological thicket, without having to kick the case out on a Church Autonomy Doctrine. Let me ask you a practical question about your case. Let's assume you win. The question that I have is, it strikes me it would be difficult for us to uphold an equal pay claim for damages once you apply a strict scrutiny, because there's so many exceptions to that Equal Pay Act. So if we were going to rule in your favor, why would not the better course be for the damages to be awarded under the Title VII claim? Because there's no dispute about the amount of damage I think you stipulated. So why would that not be a better? In other words, avoid the equal pay. Certainly, this Court could absolutely do that. It need not reach the equal pay claim, because under Title VII we prevail. I would say, though, Your Honor, that the exemptions under the Equal Pay Act do not trigger strict scrutiny, because as this Court is aware, they are neutral and generally applicable. They apply broadly to specific types of entities, and those exemptions under the Equal Pay Act all stem from the Fair Labor Standards Act. So those were industry-specific exemptions that Congress felt at the time were necessary because of those types of... That's how you argue it, but doesn't Tandon and Fulton say that's not how we look at it? We look at whether what's the stated purpose of the Title VII on the one hand or the Maryland Statute on the other or the Equal Pay Act, whichever act, and what's the purpose of it, and are there secular exemptions, secular conduct that cut against the alleged purpose that are treated better than or more favorable than religion? And there are whole sorts of exemptions that are in fact treated differently than religion. Now, religion gets the benefit of some of them, but generally I think it's tough to argue that religious conduct from an exemption standpoint isn't treated as favorably. And you don't look at... You say that's not the way we look at it. We kind of compare entities, but if we look at it the way I'm looking at it, it seems to me we have no other choice but to be in strict scrutiny. So I think the one thing that's missing from that analysis, Your Honor, is the comparability piece of it. Do they undermine the... Finish. I'm sorry. I was just going to say, do those exemptions undermine the statutory purpose in a comparable way? And I would argue that there are a distinct host of concerns that Congress was concerned about when it came to religious employers, and Congress knew that the First Amendment is a huge backstop that's already available to them. That's why Congress carved out Section 702, because it understands that these are not apples to oranges. These are distinct entities. Religious entities must be treated differently, and we respect that. You know, the reason I asked you that question, I thought it was a softball. You want to defend that argument in the Supreme Court when you can win on the suggestion? Well, I am... If you win. I will take any win you want to give me, Your Honor. But what I would say... Well, you've got to deal with the win... You've got to deal with the same question under Title VII, right? That's correct. That is correct. I mean, the... Whether it triggers strict scrutiny is a question that will arise either under Title VII or the UPA, so there's no reason for me to hide behind it. But what I'm... And the exemptions are different. Judge Foley's right about the exemptions. They're not the same. And they are. And you can't conflate those, right? So they are... It's a separate analysis. But again, you don't need to get to the EPA. And I would submit that Title VII doesn't trigger strict scrutiny under the circumstances, that those exemptions are unique, and they are different, and they are not comparable. And what the courts in Tandon and Fulton were concerned with were exemptions or statutes that were hostile towards religion. For example, we look at Lukumi, where it outlawed the animal sacrifice for overarching concerns of, what do we do with these bodies? But they didn't have those same concerns with hunting. That's where we see treating secular activity more favorable than religious activity, and we see a hostility towards religion. But here... And I think we talked about the Ninth Circuit's case in Union Gospel... But let me just stop. But why... I mean, but the argument that the defendants are going to make is you're doing the exact same thing. Your view of the Maryland Statute, Title VII, and the Equal Pay Act are doing the exact same thing. They're exempting, allowing all sorts of secular conduct that could do the discrimination without the restrictions of those statutes. But you're not... But you're preventing religious organizations from doing it. One piece that I completely omitted, and I apologize, for one of the examples that is cited by CRS is the small business. But that applies equally to a secular small business or... Sure, some of them apply both, but it allows a lot of exceptions to the purported rationale for the statutes. And maybe it exempts... It accepts some religious organizations, but it doesn't exempt others. Well... So you're giving... Anyway, I understand... Yeah, but I think what, Your Honor, is... What I would... I would just say that it does treat secular activity comparable to religious activity. There are certain, again, unique circumstances, unique to religious entities that Congress was concerned about and carved out those exemptions for them that are not available to secular entities. But I want to go back and look at... On this point, though, we've talked about the Ninth Circuit just five days ago, on March 12th, Olympus Spa v. Armstrong. And that's a case that deals with the Washington law against discrimination. It's applied to a... In this case, it was a public accommodation case. But the same arguments on free expression were made. And what the court said, finding that WLAD's exemptions are neutral and generally applicable, that said even a charitable reading that these exemptions, all they do is impose an incidental burden on religious expression. They apply to entities, not individuals. It doesn't create a mechanism for individualized exceptions, like we saw in Fulton, where we have one sort of government employee being the arbiter of having the sole discretion to decide whether or not an exemption applies or not. Here, these are mandatory exemptions that apply when they apply. But that doesn't mean, Your Honors, that when every arrow is pulled from the quiver and they fail, that that means that this court should rewrite the law and say that, well, if a religious employer isn't covered by any of these exemptions, then we should expand church autonomy and say that if a religious employer says this is a religiously motivated decision, then we can't touch it. That's inconsistent with a number of principles, Your Honor. And I would start you all with, you know, there's been a lot of talk about how... What are the wide-ranging impacts of this? Well, consider this court's opinion in Dole v. Shenandoah Valley. Very similar to the Ninth Circuit's decision in EEOC v. Fremont School, where the challenged action there was the employer didn't want to provide health benefits to a woman based on a biblical belief that men are the head of the household. Courts find that that is inappropriate. That violates secular laws. And while it's a religiously motivated decision, it doesn't mean that it complies with secular laws. And courts are allowed to step in, and that at best has some sort of incidental burden, but not a substantial burden. And so, particularly bringing that to this case, where you've got an employer that says, we hire people of all walks of life, of all faiths. That means that we understand that we're going to hire certain types of people. What it doesn't mean is that you can then decide that you can create a subclass of employees, that you can compensate them differently, and it doesn't just start with health benefits. It could be any sort of determination that we decide we're not going to pay you as much, because on the basis of sex, we decide we're not going to give you a promotion on the basis of race. There are just any number of tentacles, permutations that this court was expressly concerned about in Billard, and those concerns remain. And so that is the danger of what could happen. If a court were to say... The danger could be... I think that I hear you. The flip side of it is, you know, the CRS, CSR... I'm getting it backwards, I'm sorry. But, I mean, they could have had a policy that precludes hiring in the first place, under their view of the law. And so, you know... And that's what we had in the last case, as you know. It would prohibit hiring altogether. So it's kind of interesting. Does the fact that they have, in a sense, a less strict policy, you know, kind of work against them in some way? It seems to me you're saying it kind of does, because they're OK with hiring gay employees. They don't really have as much of a burden when you get to the point for them that becomes, you know, their kind of... their Rubicon. And, yeah, anyway, that seems odd that you're going to say their burden's less because their line's different than another organization. I would say that perhaps if they had a position, maybe that takes us more into the 702 co-religionist territory. But when we're talking about employees, and this is why the court should look at all of those factors, including the job duties of the employee themselves. And so even if you have a position where we only hire co-religionists, but if that individual is a janitor, or in this case a digital janitor, not akin to what we had in the World... I believe Worldview 9th Circuit case, where we had somebody who was a customer service representative who was talking directly to donors, who was advancing the ministry's mission in that case. We have an individual who helped maintain a database. He cleaned it up, he trained people how to use it, he didn't forward-face, he didn't interact with donors, he did none of those things. And so while Your Honor is correct that perhaps there is some sort of difference in the burden when we're looking at it, we've got to look at all of these factors under the totality of the circumstances. And looking under the totality of the circumstances, as this court does all of the time in a variety of tests, and the Supreme Court very recently, in 2023, 9-0, approved another religious test under Title VII when it talked about religious exemptions and said that the courts can and do look at those factors without wading into the theological thicket and without creating some sort of mechanism for individualized exemptions. All right, let's hear from your co-counsel. Sounds like you... unless you want to argue as part two. I am done. Thank you, Your Honor. Thank you, thank you. Mr. Siegel. Thank you, Your Honors. May it please the Court, because I only have three minutes, I'd like just to focus on making two points responsive to arguments from Your Honors and questions from Your Honor. You've got about 20 minutes coming up, I think, in the next case there, so... And that too, Your Honor. So the first point I'd like to make is that I think the questions and answers in this case and the prior case underscore the dangers inherent in adopting a broad view of the church autonomy doctrine such that it would protect any decision made by a religious employer as long as it is made for a religious reason or, as some of the briefs say, rooted in religious belief. For instance, as Your Honor's questions reflected, it's not clear that there's an administrable line as to the definition of church. That is, what entity exactly is entitled to invoke the church autonomy doctrine? In addition, there's been a fair amount of back-and-forth about the question of pretext. To what extent is an inquiry into pretext permissible? What kind of inquiry might that be? It seems to me that on one hand, you have a robust inquiry into pretext that I suspect religious organizations would be deeply uncomfortable with. On the other hand, you have deference, blind deference, to the stated religious motivations for a decision that I think would implicate some of the very serious concerns that Judge Wynn, Your Honor, articulated in some of your questioning earlier. The second point I'd like to make just very quickly, I see I have one minute left, is on this question of neutrality and general applicability. And I want to kind of reframe the argument a little bit in line with the language that Tandon itself used. Tandon asked whether a statute treats any comparable secular activity more favorably than religious exercise. And what it pointed to was activities like nail salons or hair salons, I can't remember which, movie theaters. The exceptions in AmfIPA are not for activities that are secular. They're for activities that can be either secular or religious. And that's true whether you're talking about private clubs, which the IRS recognizes expressly can be either one or any of the various other... But there is a simple solution to this whole problem. These churches can hire, use labor or volunteer labor or pay just members of their denomination in church. They got absolute control over them, don't they? Well, I'm not sure it's right, Your Honor, that a church could, as a constitutional matter, in fact, I represent it very much not right. Let me phrase it a little clearer. Of course. They hire, you have a church. It's 10,000 members. They got all the talent in the world. The only people they hire and use, either voluntarily or for pay, are their membership. If they do that, it's not a thing we can do to any one of those... to the pay issue, the national origin, anything, can we? Well, it may be that there are statutes, for instance, Title VII's religious exemption, excuse me, that may protect the church from liability there. But the Constitution does not give the religious institution carte blanche to hire... to choose to hire only, and I'll use the word co-religionist as sort of a shorthand, recognizing, of course, that it's a term that itself is a bit fraught. The Constitution does not entitle the church, whether as a matter of church autonomy or otherwise, to hire for all those 10,000 positions only members of the church. Or, frankly, members of the church who practice or believe in a particular kind of way. So when they do hire outside their membership, why doesn't federal law control, regardless? Well, with... if I understand Your Honor's question correctly, in the Title VII inquiry, or if it's a claim under Title VII, you would have to ask whether the organization and the conduct at issue fell within the religious exemption. In the context of the Maryland Fair Employment Practices Act and FEPA, the Title VII exemption would not control. What you would... what you would need to inquire, and this is sort of a fact-specific determination, is whether and to what extent those people fell within the ministerial exception, and whether they fell within the state statutory exemption for religious organizations. All right, thank you. Mr. Duggan, you have reserves of brief rebuttal. Thank you, Your Honors. Tandon controls on the question of neutral and general applicability. This is not a hard question. We focused primarily on church autonomy before, but if we're doing free exercise analysis, Tandon tells us that when you have a statutory framework with categorical exemptions, you have to treat religion at least as favorably as any secular conduct that is covered by those exemptions. Now, Judge Floyd, you mentioned the EPA, lots of exemptions in that. I would suggest Title VII and MFIPA actually have more. They exempt more conduct because of the small business exemption, and we put in the briefing the fact that about 80% of Maryland employers are small businesses. Your colleague says that applies to religious organizations, too. What's your response to that? It's not sufficient under Tandon that some religious organizations get to benefit from the exemption, because that's not what Tandon says. Tandon says religious organizations or religious, I guess, regulated parties are entitled to at least as favorable treatment as secular organizations. So you have some small businesses that are secular, some small businesses that are religious. That means that religious organizations that are comparable, comparable meaning with respect to the regulatory interest, here prohibiting workplace discrimination, they are entitled to equal treatment. One of the things here, maybe we've been grappling with this, Tandon is a procuring emergency law, but you have these direct cases, Fulton and Kennedy. Why wouldn't we rely more so in terms of what's there as opposed to saying Tandon created what appears to be a sea change of law with a procuring emergency order as opposed to the cases of Fulton and Kennedy? Well, the court could cite exclusively Fulton because Fulton itself relies on Tandon. It's cited in Fulton. But Fulton is about individualized exceptions, which we have argued applies, at least with respect to MFIPA. But the logic of Tandon, of the trilogy of cases Your Honor mentions, the one that is most relevant here is Tandon, because Tandon is the one that deals squarely with the issue of categorical exemptions. That's what we have in MFIPA. That's what we have in Title VII and in the Federal Equal Pay Act. I want to briefly address the issue of burden, because this came up a little bit, this idea of lesser power, greater power. Is it the case that we could not hire John Doe, but if we do hire him, we have to give him the benefits? This goes to the issue of what is our religion? We're the Catholic Church. We believe in ecumenical hiring. You're going to hear a case in about 40 seconds that has a different religion with different practices. But our religion says we welcome anyone to come and work for us. What we can't do, what is moral sin, according to Catholic teaching, is to take an affirmative act to give a benefit that is for spouses. And this is very similar to the argument of Catholics. That's a pretty broad statement. So it's not just the benefit of the spouse if the law, the state law or whatever requires for that to happen or something, but it's other benefits. I mean, it could well be, I don't know, there's a lot of rights that arise from being married. I mean, not the least of which might be dealing with the treatment of one spouse to another, domestic abuse, dealing with if you have a divorce or something like that, the kind of spousal support. I mean, there's a lot of issues, not just health insurance. And you're saying any benefit that would inure to someone who is married in that situation, even though you will hire that person, you, I wouldn't say have no problems with it, but you're not going to fire them because they are married to someone of the same sex. But if they get any benefit, you don't want to recognize that. Even if it means, I mean, even in an employment context, there are benefits that, you know, beneficiaries are assigned certain primary rights based upon being spousal type situation. It seems inconsistent. I mean, if you were against, you know, an individual in this situation being married, you just wouldn't hire him. That's not our religion, Your Honor. Our religion says we welcome anyone. You just don't want to give them benefits. We can't give benefits to a spouse who is not a spouse. That's our religion. That's our teaching. That, by the way, is not just something CRS made up. That's the position of the U.S. Conference of Catholic Bishops, the organization that governs the Catholic Church in this country. One last thing. Spouse, at least from, in terms of, in this country, we don't just recognize a religious means of becoming a spouse. True. And even that only becomes spouse because it's recognized by the government. I mean, there are countries that have both. I mean, you get a civil ceremony and you get a religious one. We here, I guess, sort of incorporate the religious through the laws of the government and we recognize that it can happen in that way. So, I don't, I mean, if that same law recognizes spouse here, what's the difference of how we got married, whether we got married through the Catholic Church or got married some other kind of way, we wouldn't do it. Because in our creed, as we stand before God, we can't give these benefits because that is mortal sin. This is exactly why the Church Autonomy Doctrine applies here. This very colloquy, Your Honor, the court can't resolve this question. This is a religious issue. This is reserved to the Church. I won't get into that in terms of whether you can give a benefit to someone in this instance because of your belief, even though you can recognize they exist. So, I won't go there, but we'll leave it at that. It's a tough question. All right. Well, we've got another case coming up and what we're going to do, well, first of all, thank all of you for your wonderful arguments. This is very helpful to the court. We're grappling with issues that are new to us and we'll, I mean, it's not going to be the end of the day today. No, when we come out, we know that. But, you know, these are things we're working through. So, thank you for your arguments. We'll come down and greet you. We're going to take a brief recess and then we'll come back for the last case.
judges: James Andrew Wynn, A. Marvin Quattlebaum Jr., Henry F. Floyd